Ronald KLIETHERMES, Appellant,

v.

ABB POWER T & D, Respondent;

Treasurer of the State of Missouri—
Custodian of the Second Injury
Fund, Respondent.

No. WD 66700.

Missouri Court of Appeals,
Western District.

June 17, 2008.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 29, 2008.

Application for Transfer Denied
Oct. 28, 2008.

Roger Gordon Brown, Jefferson City,
for appellant.

Richard Lee Montgomery, Jr., Colum-
bia, for respondent ABB Power.

Christina Hammers, Jefferson City, for
respondent 2nd Injury Fund.

Before JAMES M. SMART, JR., P.J.,
THOMAS H. NEWTON, and LISA
WHITE HARDWICK, JJ.

JAMES M. SMART, JR., Judge.

Ronald Kliethermes appeals the denial of his workers' compensation claim. The Missouri Labor and Industrial Relations Commission found that the claimant had failed to show a causal connection between the severe aggravation of Mr. Kliethermes' health conditions and an electrical injury he received on the job. We initially affirmed. Further reviewing the matter on rehearing, we now conclude that the Commission's decision was not supported by substantial evidence. The judgment is reversed and the case is remanded to the Commission for further proceedings.

## Background

Ronald Kliethermes began working for ABB Power T & D in 1972. On November 9, 2000, while fifty-seven years of age, he received an electrical injury on the job. After the injury, he was no longer physically able to do his job.

Mr. Kliethermes had been treated for heart problems since the 1980s. Those ailments included intermittent atrial fibrillation, mild hypertension, and mitral valve prolapse. The heart conditions were relatively stable, and were controlled with medication. It is undisputed that none of the claimant's heart conditions limited his ability to work. Also, it is undisputed that, before the injury, the claimant engaged in various recreational activities. He lifted weights three to four times a week. Among other outdoor activities, he also "power walked" about a mile-and-a-half around the plant each day during his lunch hour. This exercise involved holding his arms high and going at a fast rate of speed.

On the day of the injury, Mr. Kliethermes was testing transformers at his job. He received an electrical shock when he grabbed two electrical leads to disconnect them. He was thrown against a barrier fence and fell to one knee. He was not knocked unconscious. As far as the intensity of the current, the only thing known is that the voltage was somewhere between 5,000 volts and 70,000 volts.

A fellow worker summoned emergency personnel. The claimant's blood pressure was 235/172. He was taken to the hospital by ambulance. There, he was evaluated, treated, and held overnight. Hospital records show that he had an abnormal EKG. There was no evidence of a burn or entrance or exit wounds from the electrical charge. The claimant's heart enzymes were not elevated, suggesting no damage to the heart muscle itself. He was released the next day.

Mr. Kliethermes felt tired, drained, weak, and shaky. The shock occurred on a Thursday. He continued to feel fatigued all weekend. He was not scheduled to work again until Monday, November 13, four days later. He went to work that day but could not perform as usual because he felt fatigued and short of breath. With the assistance of co-workers, he made it through that day and the next by working lighter duty. By Wednesday of that week, still feeling bad and finding himself unable to perform at work, he requested a visit with the company doctor, Dr. Glen Cooper.

The claimant saw Dr. Cooper the next day, seven days after the shock. He complained of experiencing atrial fibrillation. Atrial fibrillation is a heart rhythm problem, an electrical dysfunction, in which the heart's two upper chambers (the atria) beat chaotically and irregularly-out of sync with the two lower chambers-causing a quivering of the upper chambers. Atrial fibrillation can cause or contribute to, among other things, experiences of fatigue, lack of energy, shortness of breath, and an overall feeling of ill-health.

On his visit to Dr. Cooper the next day (after two days of being unable to perform at work), Dr. Cooper noted an irregular

rhythm, and advised the claimant to remain off work for the time being. In late November, the claimant saw both Dr. Kanagawa and Dr. Cooper in separate appointments. He was at that time continuing to experience the same problem. He was still feeling tired and weak and fatigued. Although Dr. Kanagawa prescribed several medications, the doctor was unable to get the fibrillation under control.

On December 18, the claimant, who was still had not been cleared to return to work (and still felt bad anyway), the doctor hospitalized the claimant for "uncontrolled atrial fibrillation and elevated blood pressure." Three days later, he was allowed to leave after he seemed to have regained his heart rhythm, apparently due to new medication. However, even with the new medication, the atrial fibrillation quickly returned and he continued to be unstable.

In January 2001, Dr. Cooper referred Mr. Kliethermes to Dr. Daniel Pierce, a heart rhythm specialist and electro-physiologist. In a treatment note dated January 12, 2001, Dr. Cooper reported that "the patient was stable on his cardiac medications prior to the electrical injury [but] after the electrical injury, he has been unstable with irregular heart and hypertension."

In February 2001, when the claimant saw Dr. Cooper again, the fatigue was noted to be "rather profound" by Dr. Cooper. Dr. Cooper also stated that the electrical injury suffered at work "apparently has caused cardiovascular complications."

The doctor hospitalized the claimant again in February due to "severe labile [fluctuating] hypertension." Dr. Pierce performed a heart catheterization, but things remained unstable. In March, Mr. Kliethermes was again hospitalized for uncontrolled atrial fibrillation. In April, Dr. Pierce implanted a pacemaker. He also adjusted Mr. Kliethermes' medications.

Although neither the medications nor the pacemaker controlled the fibrillation, there seemed to be some improvement.

Dr. Pierce reported that Mr. Kliethermes was "limited in his activities and unable to work due to the intermittent and spontaneous recurrence of his arrhythmia." The doctor noted that he was "not able to safely work." The doctor said that the claimant, consistent with severe atrial fibrillation, was suffering "fatigue, shortness of breath, dyspnea, and dizziness."

Dr. Pierce, who is a heart rhythm specialist, stated that "with a reasonable degree of medical certainty, I would conclude the increase in atrial fibrillation is related to his shock."

On May 14, Dr. Cooper noted that even with the pacemaker and medications, "the patient will have very little stamina and I do not believe him stable." The doctor said the claimant's condition was one of continuing "profound fatigability that causes unplanned rest."

Dr. Cooper reported in September 2001 that Mr. Kliethermes continued to be unstable and was still subject to "profound fatigue." In October 2001, Dr. Pierce performed an ablation on Mr. Kliethermes' heart to control the fibrillation. As a result of this, Mr. Kliethermes became fully dependent on the pacemaker. The months dragged on with continued weakness, fatigue, and instability. In February 2002, Dr. Pierce wrote that the claimant continued to have recurring atrial fibrillation, fatigue, and shortness of breath. Dr. Pierce, while noting that "a cause and effect will be difficult to prove to a reasonable degree of medical certainty," correlated the injury with the onset of his "uncontrollable atrial fibrillation." He rated the disability at fifty percent.

The claimant was never cleared by any of his doctors to return to his former job.

Now that he has a pacemaker, any hope of working around electrical equipment is gone. He also would be unable to perform any physically demanding job, or any other job that would not permit unplanned rest. Mr. Kliethermes still has atrial fibrillation, with accompanying fatigue, weakness, and shortness of breath. He also experiences sensitivity to heat and cold. He is no longer able to perform the physical activities and exercises he engaged in before the accident. He was still seeing Dr. Pierce and Dr. Kanagawa as of the date of the hearing.

At the hearing, the claimant introduced the medical records of the treating physicians. The claimant also presented the deposition testimony of Dr. Kanagawa, his treating cardiologist of many years. Dr. Kanagawa testified "within a reasonable degree of medical certainty" that the electrical shock Mr. Kliethermes experienced was a "substantial factor in the cause of his cardiac problems" and in limiting his employment. Absent the shock, he said, the pre-existing heart condition would be relatively unchanged.

To rebut the claimant's case, ABB introduced the deposition testimony of Dr. Stephen Schuman, also a cardiologist. Dr. Schuman, in contrast to Dr. Kanagawa, said he could not say with a "reasonable degree of medical certainty" that there was a connection between the shock and the worsening condition. He suggested that the change in condition was a "natural and expected consequence" of the disease. Dr. Schuman, however, acknowledged that he had *never* seen or read of a case where pre-existing, intermittent, very mild, atrial fibrillation had deteriorated so rapidly as to become completely uncontrollable.

The Administrative Law Judge denied Mr. Kliethermes' claim. The ALJ found

that Mr. Kliethermes did not prove a causal connection between the shock and the change in his heart problems. The ALJ believed Dr. Kanagawa's statements were "not based on any scientific reasoning or analysis." The ALJ concluded that Dr. Kanagawa's testimony did not establish a "cause and effect relationship . . ., but rather *assumes* one, based on the temporal proximity" of the events. (Emphasis in original.)

The claimant appealed to the Labor and Industrial Relations Commission. The Commission affirmed, adopting the ALJ's opinion. One Commissioner dissented.

The claimant appeals.

### Standard of Review

Our review of the Commission's decision is governed by article V, section 18, of the Missouri Constitution and section 287.495 RSMo.[1] *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003). Article V, section 18, provides for judicial review of the Commission's award to determine whether it is "supported by competent and substantial evidence upon the whole record." *Id.*

◼ The *Hampton* court, considering the constitutional provision and section 287.495.1, stated:

A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, *i.e.*, whether the award is contrary to the overwhelming weight of the evidence. Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.

evidence is, in context, not supported by competent and substantial evidence. 121 S.W.3d at 222–23 (citation and footnote omitted). The court made clear that judicial review is to be conducted objectively, *without* viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award. *Id.* at 223. The examination of the record is a one-step process of determining whether "considering the whole record, there is sufficient competent and substantial evidence to support the award." *Id.* Thus, we look to the whole record in reviewing the Board's decision, not merely to the evidence that supports its decision. *Id.*

### Argument

The claimant says the Commission erred in denying compensation. He says substantial evidence necessitated a conclusion that there was a causal relationship between his current disability and the work-related injury. The evidence, he says, shows that the shock instantly transformed him from a physically active man to a man with substantial disability who cannot now work at his old job or engage in his usual physical activities.

### *Discussion*

We start our discussion with the deposition testimony of the claimant's treating cardiologist. Dr. Kanagawa had been treating the claimant since the early 1980s. He stated that the claimant's fibrillation before the shock was very mild. It did not keep him from working or from any of his other activities, Dr. Kanagawa said. He described the fibrillations as "slight irregularities" that were "very minor." Since the shock, he said, the claimant's heart has been "very, very irregular," and he has had "persistent trouble with recurrent episodes of rapid atrial fibrillation that are highly symptomatic." The fibrillation has been uncontrollable, despite the use of experimental drugs, a pacemaker, medi-

cations, and ablation of the heart, the doctor said.

Dr. Kanagawa testified "within a reasonable degree of medical certainty" that the electrical shock the claimant experienced was a "substantial factor in the cause of his cardiac problems" and in limiting his employment. Had the claimant not been shocked, the doctor said, his pre-existing cardiac condition would be unchanged, and it is unlikely he would have needed a pacemaker.

In a July 2003 deposition, ABB questioned Dr. Kanagawa about two letters he had written much earlier. Both indicated that he did not believe, at the time he wrote the letters, that the shock had caused any permanent physical damage to Mr. Kliethermes' heart. Dr. Kanagawa testified in response to the questions that his opinion had changed because he now sees the permanency of the claimant's condition. He noted that since the shock, Mr. Kliethermes has had continuing and ongoing fibrillation problems despite all the medical treatment. He explained that the pacemaker reports show that he still has fibrillation "even to this day." The doctor stated that "his prognosis is very poor if it hasn't been controlled in three years."

When asked if he still believes that the shock caused no permanent physical damage to the heart, Dr. Kanagawa stated:

[W]hat you notice physically and what you notice functionally [are] two different things. I mean, you can have a normal brain on a CAT scan or MRI but that doesn't mean it functions normally. And the heart is the same way. . . . . [The heart] may look fine but how it functions and how the circuitry functions [are] two different things. So I think it is more of a function thing with Ron than a physical thing that you're getting at. . . . . [H]is heart doesn't function the same since the electrical shock.

Also in his testimony, Dr. Kanagawa was asked to explain, "in lay terms," how an electrical shock affects the heart and body's electrical system. He responded:

In layman's terms it is like a re-cycling of the heart. The heart has an electrical system like a car or a telephone or anything else. And what happens when you get an electrical shock, it actually fries some of the circuits and can actually recycle the pathways.

Dr. Kanagawa stated that although the claimant is not constantly experiencing cardiac arrhythmias, the frequent arrhythmias cannot be predicted, which hampers the claimant's ability to be employed. Dr. Kanagawa stated that the claimant will require future medical treatment for physician office visits, pacemaker checks, and "probably a pacemaker revision."

### Dr. Schuman's Testimony

We turn next to the detail in the deposition testimony of ABB's expert, Dr. Stephen Schuman, who examined the claimant and reviewed medical records. He noted the various cardiac conditions that pre-existed the November 9 accident. Dr. Schuman did not find any way to verify that a change in physical pathology had occurred.

Dr. Schuman testified that it is possible that the claimant's condition deteriorated naturally between November 9 and December 18 of 2000. He said the increase in symptoms "could have been a natural and expected consequence" of the underlying pre-existing condition. However, Dr. Schuman admitted he had never seen or read of a case where pre-existing, intermittent, very mild, atrial fibrillation had deteriorated so rapidly and had become so completely uncontrollable as occurred in this case.

Dr. Schuman acknowledged that the claimant's fibrillation prior to the shock was intermittent and relatively infrequent.

After the shock, he admitted, it became "[v]ery difficult to control, actually impossible to control" with medication. He said the increase in episodes was "marked" and the change in symptoms was "severe."

As for the fatigue, Dr. Schuman "could not say" whether the shock was a "substantial factor" in causing the fatigue. He said the shock was the type of event that *could* cause a change in atrial fibrillation or in fatigue, though he did not see specific evidence that it did in this case.

Dr. Schuman could not say with a "reasonable degree of medical certainty" that there was a connection between the shock and the worsening condition in this case. He noted no report of fibrillation or a rise in cardiac enzymes within the first twenty-four hours following the shock. He agreed, though, that it is *possible* that subsequent fibrillation could be related to the shock. Second, he noted that the next hospitalization for fibrillation was not until December 18, about six weeks after the injury. If there had been fibrillation in close proximity to the shock, he said, it would be easy to say, based on a reasonable degree of medical certainty, that the two are related.

Dr. Schuman's opinion of lack of proof of causation is undermined by the fact that he failed to notice, or to believe, the objective evidence that severe weakness, fatigability, and arrhythmia did occur *in close proximity* to the injury. Perhaps his view of "close proximity" was different from what one would expect. There was an abnormal EKG shown in the hospital records immediately following the injury. Further, the claimant's history as to what he experienced from the time of hospital discharge and throughout the first week following the injury was entirely consistent with atrial fibrillation and severe aggravation of the existing heart disease, caused by the injury. Dr. Cooper, the first doctor

to see him after the hospitalization for the electrical injury, observed fibrillation one week after the injury and determined at that time that the claimant was unable to continue working.

Dr. Schuman's testimony shows that an abnormal EKG would be evidence of atrial fibrillation, even without the EKG being so bad as to show injury to the heart itself. Dr. Schuman seemed to discount, however, the abnormal EKG at the hospital. Dr. Schuman also was either unaware of, or had failed to credit, Dr. Cooper's observations of atrial fibrillation within a week of the incident, while the claimant was still having great trouble trying to function. He also apparently disregarded Dr. Kanagawa's and Dr. Cooper's late November, 2000, treatment notes which indicated that the claimant was in atrial fibrillation at the time each of them saw him, and that an EKG also was performed that confirmed atrial fibrillation. Dr. Schuman thus disregarded all of the objective evidence of atrial fibrillation occurring before December 18, as though fibrillation does not count unless one is actually hospitalized for it.

Dr. Schuman acknowledged that atrial fibrillation is a result of an underlying electrical system disease. When asked about Dr. Kanagawa's statement that the shock caused a "recycling of the pathways" by "frying" some of the circuits, he said, "I would use different terminology-that's not medical terminology." Dr. Kanagawa himself, after being asked to explain what had happened to the claimant in "lay terms," had prefaced his description with the phrase "in layman's terms . . .," meaning that Dr. Kanagawa was not purporting to use "medical terminology." The fact that something is described in "layman's terms" rather than in "medical terminology" does not mean it fails to describe a scientifically meaningful phenomenon. Dr. Schuman also had acknowledged that the

"pathways" could change, and that a change in the EKG would be consistent with that.

Dr. Schuman admitted that not all changes in the condition of the heart will show up on an imaging study. He said that one cannot see on an imaging study how the heart functions electrically (which is exactly what Dr. Kanagawa had pointed out). It is possible, he said, for an electric shock to change how the heart's electrical system works and for it not to be visible on an imaging study. In other words, *he acknowledged the validity of the concept* mentioned by Dr. Kanagawa, though Dr. Kanagawa used "layman's terms" in response to the request to do so.

Dr. Schuman admitted that the claimant has a permanent partial disability and must be restricted as to work. He said the claimant's most recent (at that time) pacemaker report was cause for concern. The increase in fibrillation shown in that report would increase Dr. Schuman's assessment of the percentage of disability. He was unable to say what the increased percentage would be, but he acknowledged that the claimant's condition was "severe," and that the fibrillation had become "uncontrollable."

### The Commission's Decision

■ The Commission, by a 2–1 vote, concluded that Mr. Kliethermes' claim was not compensable under the Workers' Compensation Act, adopting the opinion of the ALJ. The Commission found that the claimant did not prove a causal connection between the shock and the change in his heart problems. The Commission could not deny that the "frequency and severity of [his] heart problems have changed since November 9, 2000." The Commission, said that, therefore, the question, "*is whether this change was caused by the electrical shock or whether [it] is mere*

*coincidence.*" (Emphasis added.) The Commission's opinion, which adopted the ALJ opinion, was joined by a separate concurring opinion by one member, who wrote to say that he found Dr. Schuman's opinions credible, because the ALJ had not purported to rely on Dr. Schuman's opinions.

The Commission opinion noted that diagnostic testing revealed no *observable* physical changes to the heart. That would seem to be a factor not worthy of great weight in view of the fact that all of the physicians indicated that the problem was one of electrical dysfunction, not of damage to the heart muscle itself, and that such dysfunction cannot be depicted in an imaging study. The ALJ opinion, adopted by the Commission, mentioned Dr. Schuman's statement that he did not believe the electrical shock was a substantial factor in causing the change in frequency and severity of the heart problems, but did not purport to rely upon Dr. Schuman's credibility.

The Commission opinion said Dr. Kanagawa's suspicion that the electrical shock "fried" circuits in the heart's electrical system was "not based on any scientific reasoning or analysis." Rather, it believed the doctor's opinion was based only on a "temporal proximity" between the shock and the increase in symptoms. It amounted to no more than a "layman's suspicion," the Commission said. The Commission found that the claimant failed to establish a causal connection through Dr. Kanagawa's testimony. The Commission said that, "Dr. Kanagawa's testimony does not establish a cause and effect relationship between the complained-of condition and the asserted cause as required by *Davis v. General Electric*, [991 S.W.2d 699 (Mo. App.1999)], but rather *assumes* one, based on the temporal proximity."

ABB, in arguing the correctness of the Commission's decision, points to Dr. Schuman's belief that one could not demonstrate that there was a connection to the electrical injury. ABB also, searching for additional factors, points out that, a little over a month before the electrical injury, the claimant mentioned, in an appointment with his family physician, that he had been "very tired" and had been having some trouble sleeping. None of the doctors indicated that such fact was significant, and none linked that fact to any of their opinions or views concerning either fatigue or atrial fibrillation. Nor was there any other indication that the claimant had any difficulty with work or his other activities in the period before the electrical injury. Thus, the only meaningful evidence *supporting* ABB's position, and the decision of the Commission, is the opinion of Dr. Schuman, which we reject for the reasons stated below.

### Key Factors

The key factors that drive us to our conclusion are as follows:

- There is obvious medical significance to the "temporal proximity" of claimant's disability as related to the accident. *See, e.g., Cochran v. Indus. Fuels & Res., Inc.,* 995 S.W.2d 489, 495 (Mo.App.1999). Dr. Schuman acknowledged that if there were atrial fibrillation "in close proximity" to the injury (by which he apparently meant sooner than six weeks), it would indicate a causal connection. Dr. Schuman, however, was inconsistent in indicating whether he knew that the claimant experienced atrial fibrillation between the date of the shock and the hospitalization six weeks later on December 18, 2000. In his deposition, introduced at the hearing, he seemed to be unaware of the documented reports of fibrillation, but in his earlier written report, he acknowledged that early fibrillation was reported in the

medical records he reviewed. It seems that, regardless of the data, he had in his head the idea that the claimant had little or no difficulty until the December 18 hospitalization. That conclusion is distant from reality, as shown by the medical records. One can reach such a conclusion only by ignoring or disbelieving (without warrant) the claimant's reported history and medical visits to Dr. Cooper and Dr. Kanagawa following the injury

- The claimant, who was active and able to work without difficulty before the shock, has never, since the shock, recovered the energy, conditioning, and endurance he enjoyed before the shock. There is no dispute about the fact that the claimant could not successfully perform even one day of work after the shock. After two days of stoically and unsuccessfully attempting to perform at work, he saw the company physician, Dr. Cooper, who put him on medical leave from work. He has never been medically allowed to return to work at ABB.

- Dr. Schuman admitted he never heard of anyone with mild atrial fibrillation deteriorating so rapidly. And when he says "so rapidly," he is apparently referring to the period between the November 9 injury and the December 18 hospitalization, not the virtually *immediate* deterioration which was actually shown to be the case. Again, Dr. Schuman seems in denial of the fact that the claimant began experiencing difficulty controlling the fibrillation and fatigue promptly, if not immediately, after the electrical shock and was unable to work. Dr. Schuman seems to forget that the claimant's abnormal EKG at the hospital, while not so abnormal as to show physical damage to the heart *muscle,* was consistent with the occurrence of atrial fibrillation.

- The ALJ and the Commission erred in regarding Dr. Kanagawa's explanation of the effect of the shock as not "scientific" and no better than a "suspicion." Neither Dr. Schuman nor any other expert said that Dr. Kanagawa's remarks were "not scientific." Dr. Schuman simply said it was "not medical terminology," with which Dr. Kanagawa would agree (because it was his purpose to answer in "layman's terms," as he was *asked to do* ). Dr. Schuman clearly agreed with the concept that a shock *could* redirect the electrical pathways and that such a physical event in the heart would not show up on objective measurements. The fact that Dr. Kanagawa, an experienced cardiologist, described something in "layman's terms" does not mean he lacked professionalism or was engaging in a "layman's suspicion" and was not scientific.

- The Commission failed to appreciate that Dr. Kanagawa did not at first conclude there was a causal relationship. He did not jump to such a conclusion. He at first assumed the atrial fibrillation in the late fall of 2000 would be temporary. He also, like Dr. Pierce and Dr. Cooper, was aware that it would be difficult to show through objective measurement that the increased atrial fibrillation resulted from the electrical shock. But Dr. Cooper and Dr. Pierce both thought that the electrical injury had caused cardiac complications.

- Continued study of the matter by Dr. Kanagawa, and the continued inability to control the fibrillation, convinced the doctor that there was such a marked and severe deterioration from the prior mild condition to the current state that it only made sense medically that the electrical shock must have caused a recycling of the electrical

pathways, which in turn produced the extremely rapid deterioration. This appears to have involved a judgment that physicians are often called on to make in considering a history reported by a claimant. For example, both Dr. Cooper and Dr. Pierce exercised such a judgment, believing there was a connection between the injury and the current disabling condition of the claimant. Dr. Kanagawa and the others certainly *did* consider the "temporal proximity," but not without good scientific reason.

• Dr. Schuman also acknowledged that an electrical shock *could* produce such a result. Dr. Schuman, however, by ignoring some of the data, ended up with an essentially irrational explanation for how the claimant's condition declined. He said it could be natural deterioration, and yet he *had never seen or even heard of such a rapid major natural deterioration.* He had no explanation for how (even if he ignores the early fibrillation), the claimant could go, in less than two months, from a very stable condition to an "uncontrolled," and "severe," (using Dr. Schuman's own terminology) condition. Although his disease would have progressed naturally as a part of the aging process, there is *no reason* to believe that, absent the electrical injury, he would have gone precipitously from being stable and active at 57 years of age to being significantly disabled at 57 years of age very promptly after the injury, with neither medication, ablation, nor a pacemaker being sufficient to deliver him from disability.

• There is no hint that the claimant is a malingerer. The record speaks loudly that he was an energetic fifty-seven year old who loved being active and pursuing a healthy lifestyle. He did have heart disease, including electrical conduction disease, but it was entirely non-disabling, and the claimant evidently did everything he consciously could to keep it stable. His attempt to return to work four days after the injury was, in keeping with his apparently hardy psychological make-up, more likely an exercise in hopeful stoicism than in realism.

• In a separate concurring opinion, one Commission member stated that he believed Dr. Schuman; however, the ALJ and the Commission's ruling never expressed specific belief in or reliance upon Dr. Schuman's opinion. The Commission's ruling purported to rely on the claimant's alleged failure of proof, due to the *perceived* deficiencies in Dr. Kanagawa's allegedly non-scientific testimony. Thus, only one Commission member actually expressed belief in Dr. Schuman's opinion.

• The dissenting Commissioner, in disagreeing with the majority, pointed out that the majority overlooked the fact that Dr. Pierce, the electro-physiologist (of all the physicians, the one with the most experience and specialized knowledge in rhythm disease), who acknowledged that although the causal relation was difficult to prove, concluded that, because the atrial fibrillation could no longer be controlled with medication: "The patient has continued to suffer greatly increased palpitations and recurrent atrial fibrillation since his electrical shock and with a reasonable degree of medical certainty, *I would conclude the increase in atrial fibrillation is related to his shock.*" To the extent that Dr. Kanagawa is non-scientific because he expresses an opinion without having an imaging study comparing the heart functioning before and after the injury, surely Dr. Pierce was also presumably non-scientific in reaching his view (as

was Dr. Cooper, who also expressed belief that the shock *caused* "cardiac complications").

## Two Possibilities

The ALJ, after properly stating that the issue of causation was a choice between two possibilities (the notion that the injury *caused* the severe change in the claimant's condition, and the notion that the suddenness of the deterioration was a *"mere coincidence"*), then went astray in choosing because the ALJ forgot that the facts did not lend themselves readily to the "mere coincidence" possibility. The ALJ, who was purporting, in essence, *not* to decide what really happened (on the basis of failure of proof), was actually (without recognizing it) deciding that the "mere coincidence" notion was more scientific and made more sense than the views of three physicians. The Commission (and this court the first time on appeal) did not fully appreciate the significance of the logical difficulty of purporting to deny a claim based on a failure of proof when the particular facts of the case so poorly lend themselves to such a determination.

Two Commissioners did have some sense of the logical problem here, which is why one of them went out of his way to separately state that he found Dr. Schuman's views persuasive, as though that solved the logical problem. It did not solve the problem, however, as revealed in our discussion of Dr. Schuman's testimony. The dissenter also saw the logical problem, and realized that it made no real sense to suggest that the "mere coincidence" possibility was any kind of a plausible explanation at all.

This is a case in which merely taking an agnostic position (as Dr. Schuman purported to) could not work, because there was no possibility that the claimant was faking, or was imagining the aggravation of his symptoms as part of some psychosomatic disturbance. Either the electrical injury profoundly aggravated the electrical dysfunction of the heart, or we have just read about an amazing coincidence that is formerly undocumented in medical literature: an abrupt, virtually overnight, "natural progression" of electrical disturbance of the heart—a change from "mild" and "controlled" disturbance to "severe" and "uncontrolled," without any intervention by any outside forces. And it just happened to occur at the same time as the claimant received an electrical injury.

## Summary and Conclusion

Initially, the doctors treating the claimant assumed that although the atrial fibrillation apparently was altered by the electrical injury, it would be hard to *demonstrate* the relationship of the aggravation of his atrial fibrillation to the electrical injury. They thought this because they assumed that the claimant would soon be able to regain control of the condition through medication adjustments, or at least through ablation and a pacemaker. They assumed any disruption was temporary. But after three years of finding the atrial fibrillation to be uncontrollable and severe, after failed experimentation with different medications, after ablation, and after the installation of a pacemaker, they could not deny the obvious, though they had no imaging studies that would demonstrate the change visually: *the electrical shock must have caused a recycling of the electrical pathways of the heart and that is what so drastically altered the claimant's condition.* There was no other medically plausible explanation.

Dr. Schuman offered no plausible countervailing theory that would explain the data. Yes, he said, it could have been only the natural progression of the disease; but no, he had never heard of such a drastic

natural progression of disease in such a short time. In short, he lacked an opinion based on reasonable medical certainty that would adequately explain the data. He chose to ignore some of the data (in particular, the data related to the claimant's condition between November 9, 2000, and December 18, 2000, which showed the early correlation between the injury and the severely increased atrial fibrillation); then he argued that the evidence did not show the connection because there was no early data of fibrillation difficulty. One can be skeptical of anything, but it is another thing to ignore data and reject an obvious theory, while offering only "mere coincidence" as the proper explanation for the timing of this abrupt deterioration.

■ While our review is objective, we defer to the Commission as to credibility calls. *Mihalevich Concrete Constr. v. Davidson,* 233 S.W.3d 747, 753 (Mo.App. 2007). There is not even a hint that the Commission did not find the claimant himself credible. Nor is there any indication that any of the physicians were skeptical of the claimant's integrity. Looking further at credibility issues, we note that none of the physicians testified in person. The ALJ had no opportunity to personally discuss the facts and conclusions with the doctors. The ALJ and the Commission had access only to medical reports, and to the depositions of Dr. Kanagawa and Dr. Schuman. This court is also capable of reading the depositions and reports.

As we mentioned, only one of the Commissioners expressed reliance on the opinions of Dr. Schuman, which opinions, in themselves, could hardly be viewed as stating any clear position as to the ultimate issue of causation, and certainly not a scientifically supportable one. The Commission's opinion instead explicitly said it did not believe Dr. Kanagawa's theory was scientific and seemed to avoid extolling the scientific insight of Dr. Schuman.

While we agree that the Commission rejected Dr. Kanagawa's opinion, our focus has been on the *reason* the Commission had for doing so. We believe the Commission rejected Dr. Kanagawa's opinion, and, therefore, also implicitly rejected Dr. Pierce's and Dr. Cooper's (whose views were presented in medical reports and letters), partly because it thought that without an empirical test or scan showing in a measurable, concrete way exactly what happened as a result of the electrical shock, *no one* could say with reasonable medical certainty that the greatly increased atrial fibrillation problems were related to the electrical injury. We think that view is not supported by the evidence or by sound logic, and was based on the Commission's unfortunate conclusion that Dr. Kanagawa's use of "layman's terminology" to answer a question at the deposition means that his opinions were "not scientific."

■ This is a case in which the Commission failed to accord to Dr. Kanagawa and Dr. Pierce (both of whom found a causal relationship between the injury and the disability) and also to Dr. Cooper (who early observed the fibrillation after the injury and also concluded four months after the incident that the work injury "apparently has caused cardiovascular complications") the objective weight their observations and learned opinions deserved. While not all theories are objectively measurable, some are so consistent with the data observed that they are scientifically compelling. Such a theory carries much greater weight than the notion that something may have happened by "mere coincidence," particularly when applied to a stunning and drastic aggravation of a medical condition in a way that is apparently entirely unknown to medical science.

We believe the Commission misunderstood the facts and the medical testimony. We believe the view that the severe and uncontrollable aggravation of the claimant's heart conditions occurred abruptly by "natural progression" is without any evidentiary support. There was no substantial evidence supporting the Commission's decision. We base our conclusion on an objective review of the entire record of the case.

### Other Arguments

The claimant raises other issues on appeal, including the extent of his disability, whether there is second injury fund liability, and whether he is entitled to a fifteen percent penalty for ABB's violation of a state statute. Resolution of these issues will remain for the Commission in view of our reversal of the Commission's decision regarding causation.

### Conclusion

Because we determine that the decision of the Commission was not based on substantial evidence, we reverse the decision of the Commission and remand the case to the Commission for further proceedings.

NEWTON and HARDWICK, JJ., concur.