

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI ex rel. | ) | |
| JEREMY STARR, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD87111 |
| | ) | |
| BOARD OF TRUSTEES FOR THE | ) | |
| FIREFIGHTERS' PENSION | ) | |
| SYSTEM OF THE CITY OF | ) | |
| KANSAS CITY, MISSOURI TRUST, | ) | Filed:  February 19, 2025 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Cory L. Atkins, Judge**

**Before Division Two:  Alok Ahuja, P.J., and**
**Edward R. Ardini, Jr. and  W. Douglas Thomson, JJ.**

Jeremy Starr worked as a firefighter in Kansas City for eighteen years.  He developed bilateral carpal tunnel syndrome, and cubital tunnel syndrome in his left elbow.  He has not been able to work as a firefighter since May 2020.  The Board of Trustees of the Kansas City Firefighters' Pension System determined that Starr was permanently and totally disabled, and was entitled to a disability pension.  It also concluded, however, that Starr had failed to prove that his disability was duty-related; the Board therefore awarded him a smaller non-duty

disability pension. Starr petitioned for judicial review in the Circuit Court of Jackson County. The circuit court reversed the Pension Board's denial of a duty-related disability pension, and the Board appeals. We affirm the circuit court's judgment.

## Factual Background

Jeremy Starr began working for the Kansas City Missouri Fire Department in January 2003. Between 2015 and 2019, Starr experienced work-related injuries to his back and left and right shoulders, which resulted in permanent partial disability. The City settled Starr's claims for worker's compensation benefits for these injuries. As a result of these injuries, Starr was assigned to modified duty, involving performance of administrative rather than fire suppression duties, for significant periods of time between August 2015 and May 2020.

On May 18, 2020, Starr reported pain, numbness, tingling, and swelling of both hands to the Fire Department. Starr's treating physician, Dr. CW,[1] diagnosed him with left cubital tunnel syndrome, left carpal tunnel syndrome, and right carpal tunnel syndrome. Dr. CW performed surgery on both of Starr's hands and his left elbow. Starr continued to experience significant pain in both hands after the surgery, and a functional capacity evaluation concluded that Starr could not meet the physical demand requirements of the firefighter position. In December 2020, Dr. CW determined that Starr would not see meaningful post-surgical improvement and released Starr with permanent restrictions on how much weight he could lift, carry, push, or pull. Starr received a second opinion

---

[1] Pursuant to § 509.520.1(5), RSMo, we do not provide the names of any non-party witnesses in this opinion.

from Dr. BT, who also found that Starr had reached maximum medical improvement and would not be able to meet the physical demands of his job as a firefighter.

In 2020, Starr settled a worker's compensation claim with the City of Kansas City for approximately 15% permanent partial disability to his left hand and wrist, and approximately 17.5% to his right hand and wrist, both based on carpal tunnel syndrome. The settlement also provided Starr with benefits based on a permanent partial disability of approximately 15% to his left elbow based on cubital tunnel syndrome.

On March 29, 2021, Starr filed a claim for duty-related disability pension benefits with the Pension Board. Starr's claim documents included Dr. CW's medical report. In the report, Dr. CW answered "yes" when asked if Starr's injury arose out of his employment, and stated that the injury was caused by "[r]epetitive hand activities as a firefighter."

In accordance with Kansas City's Firefighter Pension Ordinance, the Pension Board appointed two doctors from its Medical Board, Drs. MP and CF, to evaluate Starr's claim. Both doctors were asked to determine whether Starr had suffered a total and permanent disability; they were also asked to "please be specific and detailed as to the cause or causes of the disabling condition, and please identify the extent to which the disabling condition is attributable to [Starr's] performance of duty as a firefighter." The doctors were provided with the medical records in the Pension Board's possession, as well as a job description for the firefighter position.

Both Drs. MP and CF conducted independent medical examinations of Starr, and each concluded that he was totally and permanently disabled. Dr. MP's report concluded that "Mr. Starr's series of work related cumulative trauma was the direct, proximate and prevailing factor causing both his work related medical conditions, treatment and disability." Dr. CF similarly opined that Starr's work as a firefighter was the predominant factor which substantially caused his peripheral nerve entrapments and consequent disability. Both Drs. MP and CF stated in their reports that Starr's disability was "substantially due to the incident summary in the report provided to [them] from the Firefighters Pension System."

The Pension Board sent follow-up letters to both doctors, asking them to state the facts supporting their conclusions that Starr's disability was substantially caused by his work as a firefighter.

Dr. MP provided a supplemental letter which gave the following causation opinion to a reasonable degree of medical certainty:

> Mr. Starr has been employed by one employer since 1/27/03. Mr. Starr was engaged in full time employment with the City as a Firefighter for approximately 18.5 years. He denied any work performed outside of KCFD after his illness/injury. His recreational, social or home activities referenced in medical records before the injury or illness included working out at the gym; yard work and church activities. Firefighter Starr['s duties] included wearing personal protective ensemble and SCBA; performing firefighting tasks (hose line operations, extensive crawling, lifting and carrying heavy objects, ventilating roofs or walls using power or hand tools, forcible entry rescue operations); and other emergency response actions under stressful conditions including working in extremely hot or cold environments for prolonged time periods. Firefighter Starr performed these repetitive duties involving his upper extremities while lifting, carrying, ventilating roofs or walls, using

4

power or hand tools and performing rescue operations.  In each of these situations, it was necessary for him to utilize his upper extremities on a regular, repetitive basis, oftentimes in adverse or inclement weather.  The use of power and vibrating tools are well known predictors of upper extremity overuse injuries consistent with his ensuring [*sic*] medical conditions (i.e. left cubital tunnel syndrome; right carpal tunnel syndrome; left carpal tunnel syndrome) resulting in surgeries with bilateral hand numbness and loss of grip strength which was not present prior to his series of work accidents.

Dr. CF's supplemental letter states, in relevant part:

Mr. Starr developed severe bilateral carpal tunnel syndrome and left sided ulnar nerve entrapment at the elbow.  Medical records substantiate his symptoms were progressively symptomatic for more than 5 years (perhaps as long as 8 years) prior to his alleged date of work injury in April 2020.

Peripheral nerve entrapment usually develops over a span of years and not commonly as the result of an acute injury . . . .  Based on the medical records and review of the essential functions of his job duties, the performance of repetitive in combination with high force hand activities necessary in his job duties as a firefighter over his 18-year employment with the KCFD substantially caused the severe bilateral carpal tunnel syndrome and left sided ulnar neuritis at the elbow.  Scientific occupational medicine literature reports this combination of risk facts (high repetition and high force or awkward positions) as the predominant cause of peripheral nerve entrapment; in addition, the claimant does not have any personal health conditions that place him at higher risk for development of peripheral nerve entrapment.  The actual performance of his firefighter duties was the predominant factor and substantially caused the peripheral nerve entrapments.

The Board denied Starr's claim for duty-related disability pension benefits and granted him a non-duty disability pension.  Starr filed a request for reconsideration.  The Board held a hearing on reconsideration on October 22, 2022.  Prior to the hearing, Drs. MP and CF were deposed, and their depositions

were introduced into evidence at the reconsideration hearing in lieu of live testimony.

During their depositions, Drs. MP and CF were both asked what work activities caused Starr's carpal tunnel syndrome and cubital tunnel syndrome. Dr. MP testified:

> A: Those include performing firefighter tasks such as hose line operations; crawling; lifting; carrying heavy objects; ventilating roofing or walls using power and/or hand tools; use of forcible entry; and rescue operations.
>
> In addition, his repetitive duties included lifted and carrying, sometimes in awkward positions and inclement weather. The use of power and vibrating tools is a well-known predictor of upper extremity overuse injuries consistent with those sustained by Mr. Starr during his work duties.

Dr. MP testified that he had performed Independent Medical Examinations on other firefighters performing similar duties as Starr who had developed carpal and cubital tunnel syndromes; he testified that it was "not uncommon" to see firefighters with these injuries.

For his part, Dr. CF testified:

> [Y]ou have to have a combination of risk factors in the occupational setting in order to develop carpal tunnel syndrome. By that I mean, you have to have either both high repetition and high force, or you have to have high repetition and awkward position in order to attribute the development of carpal tunnel syndrome to the occupation.
>
> . . . .
>
> Fire fighters in general do operate a significant amount of equipment that requires significant force as well as vibration. I failed to mention that vibration is – exposure to vibration is also an occupational risk factor for carpal tunnel syndrome. So when you look at the fact that fire fighters use a significant amount of

6

equipment that requires repetitive forceful gripping, twisting, lifting, in combination with vibration, I think that those are the issues in his job duties that place him at risk.

Dr. CF also testified that Starr exhibited "no other non-occupational risk factors" which would explain the nerve impingement conditions he experienced.

On January 26, 2023, the Pension Board issued its Decision on Starr's request for reconsideration, which concluded that "Mr. Starr has not sustained his burden to demonstrate that his disability was substantially caused by his actual performance of duties as a firefighter." The Board rejected two of Starr's specific claims concerning his performance of work which exposed his upper extremities to dangerous vibrations. Thus, the Board rejected Starr's testimony that driving a pumper truck entailed greater vibrations than a typical automobile, and contributed to his disability; the Board instead credited the testimony of a Battalion Chief that pumper trucks have power steering, and cause no more upper-extremity vibrations than a personal vehicle. The Board also noted that "the records of Mr. Starr's work assignments with the [Fire Department] indicated that he rarely drove a pumper during the three-year period of time leading up to his disability in late April 2020."

The Board also found that Starr had "embellished the true facts as to his frequency and intensity of use of vibrating power tools," and instead credited the Battalion Chief's testimony "that such tools are rarely used by firefighters in emergency situations."

The Pension Board also found that Starr's use of chainsaws was limited. Although Starr testified that he was required to test chainsaws at the beginning of every work shift when he was assigned to particular pumper trucks, the Board noted that such brief testing was distinguishable from "the more rigorous and

7

intense use of that tool as part of fire suppression or other emergency activities," and that Starr had not been assigned to the relevant pumper trucks "for the 16-month period preceding the onset of his disability in his upper extremities in late April of 2020." Because Starr was not assigned to the relevant pumper trucks in the sixteen months preceding his report of disability in April 2020, the Board stated that "it appears implausible that repetitive work activity in the form of testing chain saws while working on pumper 27 or pumper 28 substantially contributed to the onset of his disability in April of 2020."

The Board also emphasized the extended periods during which Starr was assigned to light duty work between February 2018 and April 2020. The Board's decision observes "that for more than half of the time during the 27 months leading up to the onset of his disability Mr. Starr was not performing *any* type of work for the KCFD involving the types of repetitive motions that could have contributed to his disability."

The Board rejected the uniform opinions of Starr's treating physician, and of the two Medical Board physicians who examined him, that Starr's nerve impingements were caused by his work as a firefighter. The Board based its rejection of the physicians' causation opinions upon its conclusion that the physicians had relied on Starr's inaccurate description of his work duties:

> Although both a treating physician and two independent medical examiners opined that Mr. Starr's disability was substantially caused by his performing duties as a firefighter, as noted above, the Board does not defer to their opinions as to findings of fact on the work-relatedness of a disability, and for good reason as indicated in this case. Those physicians formed those opinions based on discussions with Mr. Starr, not based on an examination of Mr. Starr's work assignments and work duties performed on behalf of KCFD. When Mr. Starr was asked at the hearing whether he

8

discussed with [Dr. MP] the frequency he performed certain work activities that might have contributed to his disability, Mr. Starr's response was evasive and defensive in both his answer and his demeanor, stating that he didn't know what he discussed with [Dr. MP], he was just going to a doctor's appointment, being honest with the doctor and letting the doctor do his job as a doctor. Mr. Starr's testimony and demeanor in response to that questions [sic] suggested a lack of credibility. Moreover, the only reasonable inference, based on the record, is that the medical opinions as to the duty-related causation of Mr. Starr's disability were derived from statements made by Mr. Starr himself to the physicians as to the work duties he allegedly performed for the KCFD, which as explained herein, we find largely lacking in credibility.

Starr filed a petition for judicial review in the Circuit Court of Jackson County on February 2, 2023.

On March 12, 2024, the circuit court issued its judgment reversing the Board's denial of Starr's claim for duty-related pension benefits. The circuit court concluded that, under Kansas City's Firefighter Pension Ordinance, the Pension Board was required to defer to the conclusions of the physicians on its Medical Board concerning the cause of Starr's disability. The court also found that the Board had acted arbitrarily and capriciously by focusing on Starr's job duties in the few years preceding the onset of his disability, despite the testimony of Drs. MP and CF that Starr's disability developed progressively over his eighteen-year firefighting career. The circuit court also concluded, more generally, that the Pension Board's decision was unsupported by competent and substantial evidence.

The Board appeals. Because this is a contested case in which we review the Decision of the Pension Board rather than the judgment of the circuit court, the briefing order has been reversed under Supreme Court Rule 84.05(e) and

9

Western District Rule 35. "Thus, while the party aggrieved by the *circuit court's* decision files the notice of appeal, the party aggrieved by the *agency's* decision files the appellant's brief, and bears the burden to show that the agency erred in the first instance." *Casnocha-Jones v. State Bd. of Nursing*, 686 S.W.3d 695, 704 (Mo. App. W.D. 2024).

## Discussion

On an appeal from a judgment of a trial court addressing the decision of an administrative agency [in a contested case], we review the decision of the administrative agency and not the judgment of the trial court. According to Article V, Section 18 of the Missouri Constitution, we must determine whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law. A court reviewing the actions of an administrative agency should make a single determination whether, considering the whole record, there is sufficient competent and substantial evidence to support the award. This standard would not be met in the rare case when the [agency's decision] is contrary to the overwhelming weight of the evidence. If the ruling is supported by competent and substantial evidence upon the whole record the ruling will be affirmed, even though the evidence would also have supported a contrary determination.

Though we consider the entire record to determine whether the decision is supported by competent and substantial evidence, we may not substitute our judgment on the evidence for that of the agency, and we must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses. We must look to the whole record in reviewing the [agency's] decision, not merely at that evidence that supports its decision, and we no longer view the evidence in the light most favorable to the agency's decision. When an administrative agency decision is based on the agency's interpretation and application of the law, we review the administrative agency's conclusions of law . . . *de novo*.

*Taylor v. Bd. of Trs. of Firefighters' Ret. Plan of St. Louis*, 632 S.W.3d 436, 441-42 (Mo. App. E.D. 2021) (cleaned up).

The Pension Board's decision must be affirmed unless it is:

> (1)    Is in violation of constitutional provisions;

> (2)    Is in excess of the statutory authority or jurisdiction of the agency;

> (3)    Is unsupported by competent and substantial evidence upon the whole record;

> (4)    Is, for any other reason, unauthorized by law;

> (5)    Is made upon unlawful procedure or without a fair trial;

> (6)    Is arbitrary, capricious or unreasonable;

> (7)    Involves an abuse of discretion.

§ 536.140.2.[2]

## I.

In his first Point, Starr contends that the Pension Board was required to defer to the opinions of the Medical Board physicians that Starr's disability was substantially caused by his work as a firefighter.  We disagree.

The relevant Kansas City ordinance provides for both duty and non-duty disability pension benefits for firefighters who become permanently and totally disabled.  While both duty and non-duty pensions provide lifetime benefits, the calculation of a duty disability pension results in a higher monthly benefit amount than a non-duty disability pension.

---

[2]    Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

The ordinance draws a distinction between the determination (1) whether a claimant *is disabled*, and (2) whether the disability *is work-related*. The ordinance also makes clear that the process for answering those two questions is different. KANSAS CITY, MO., CODE OF ORDINANCES § 2-1267 provides in relevant part:

> (a) *Duty disability.*
>
> (1) A member, regardless of age or years of creditable service, who becomes totally and permanently disabled, as defined in this division, prior to the time he is otherwise entitled to pension under this division, and **substantially caused by actual performance of duty as a firefighter, as determined by the board of trustees in accordance with its fact finding procedures**, shall be retired on the first day of the month following determination by the board of such disability. **Such fact finding procedures may require review of the facts regarding the line of duty incident by a subcommittee of the board; or by an independent fact finder appointed by the board; and in consultation with a legal advisor retained by the board**. The city, and any employee or official of the city, shall cooperate with the fact finding procedures, and shall divulge information as requested by the board in determining the duty disability of a member.
>
> . . . .
>
> (c) *Determination of disability status.* **A member shall be deemed to have become totally and permanently disabled when the member is in a state or condition of disability which presumably prevents the member from performing the duties of a firefighter for the rest of the member's life**. Such disability, whether duty or nonduty, must not have been contracted, suffered or incurred while the member was engaged in or result from having been engaged in a criminal act or enterprise, or result from habitual drunkenness or addiction to

12

narcotics or from self-inflicted injury, or from disability incurred while in the service in the armed forces of the United States or any foreign country.

> (d)    *Authority of board of trustees.*  ***The board of trustees in its sole judgment shall determine whether the status of total and permanent disability exists***, and its determination shall be binding and conclusive, subject to any right of review provided by this division.  ***In making such determination, the board of trustees shall rely upon the findings of a medical board***, as defined in this division.  The written opinion of any two members of the medical board shall be required.  The medical board shall be appointed by the board of trustees, and the expenses of an examination by the medical board shall be paid from the funds of the retirement system.

(Emphasis added.)

> Interpretation of municipal ordinances . . . [is a] question[ ] of law and reviewed de novo.  The rules governing interpretation of a statute are employed when interpreting an ordinance.  Accordingly, the Court will ascertain the intent of the municipality, give effect to that intent, if possible, and consider the plain and ordinary meaning of the language used.

*City of St. Peters v. Roeder*, 466 S.W.3d 538, 543 (Mo. 2015) (citations omitted).

The plain language of § 2-1267 establishes that the Board was not required to give any particular deference to the Medical Board's opinions as to whether Starr's disability was work-related.  Starr seizes on the language of § 2-1267(d), which states that, in "determin[ing] whether the status of total and permanent disability exists," "the board of trustees shall rely upon the findings of a medical board."  Even if this language requires the Board to defer to the Medical Board concerning *whether a firefighter is permanently and totally disabled*, Starr's disability status is not in dispute:  the Pension Board *found* Starr to be

permanently and totally disabled, consistent with the opinions of Drs. MP and CF.

The question *here* is not whether Starr is permanently and totally disabled, but whether that disability was "substantially caused by actual performance of [Starr's] duty as a firefighter." The question of *work-relatedness* is not governed by § 2-1267(d), but instead by § 2-1267(a). And § 2-1267(a) does not require the Pension Board to "rely upon the findings of a medical board" in determining work-relatedness. Instead, § 2-1267(a) provides that work-relatedness shall be decided using the Board's "fact finding procedures." Section 2-1267(a) provides that the Board's fact-finding procedures

> may require review of the facts regarding the line of duty incident by a subcommittee of the board; or by an independent fact finder appointed by the board; and in consultation with a legal advisor retained by the board.

The fact-finding procedures specified in § 2-1267(a) contemplate that members of the Board may determine the work-relatedness issue, that the Board may delegate the issue to an independent fact-finder, and that it may consult with a legal advisor in making the required determination. Nothing in § 2-1267(a) specifies any particular role *for the Medical Board* in making the work-relatedness determination. While the Board is required to "rely" on the opinions of its Medical Board in determining whether a firefighter is permanently and totally disabled, no similar reliance is required with respect to the separate question whether the firefighter's disability was "substantially caused by actual performance of duty as a firefighter."

Point I is denied.

## II.

In Points II, III, and IV, Starr argues that the Board's denial of duty disability pension benefits was arbitrary, capricious, unreasonable, and not supported by substantial evidence. We address Points II through IV together.

> Substantial evidence is competent evidence that, if believed, has probative force upon the issues. An administrative agency acts unreasonably and arbitrarily if its decision is not based on substantial evidence. An agency action is capricious if it is whimsical, impulsive, or unpredictable. To meet basic standards of due process and to avoid being arbitrary, unreasonable, or capricious, an agency's decision must be made using some kind of objective data rather than mere surmise, guesswork, or gut feeling.

*Walsh v. Missouri State Bd. of Nursing*, 689 S.W.3d 566, 569-570 (Mo. App. W.D. 2024) (citations omitted).

In determining eligibility for disability pension benefits, "the claimant has the burden of establishing his or her entitlement to benefits." *Hay v. Schwartz*, 982 S.W.2d 295, 301 (Mo. App. W.D. 1998) (citing *Knapp v. Mo. Local Gov't Emps. Ret. Sys.*, 738 S.W.2d 903, 912 (Mo. App. W.D. 1987)); *see also Byous v. Mo. Local Gov't Emps. Ret. Sys. Bd. of Trs.*, 157 S.W.3d 740, 744 (Mo. App. W.D. 2005).

The Pension Board rejected the opinions of Starr's treating physician and the Medical Board doctors, and consequently found that Starr had failed to satisfy his burden to prove work-relatedness, based primarily on two factors: (1) that Starr had overstated his use of particular vibrating equipment (driving a pumper truck; using power tools and chainsaws); and (2) that Starr had been on modified duty, and was therefore not exposed to the rigors of fire suppression work, for half the time in the twenty-seven months before his disability manifested.

15

In Point II, Starr argues that the Pension Board arbitrarily focused on Starr's duties during the two-to-three years immediately preceding the onset of his disability in May 2020, when the evidence established that his carpal- and cubital-tunnel conditions developed over many years. In Point III, Starr asserts that the Board arbitrarily focused its analysis on Starr's use of particular vibrating tools, and thereby ignored the Medical Board's identification of numerous other job duties, and other work demands, which contributed to his injuries. Finally, in Point IV, Starr argues that the Board erroneously asserted that Drs. MP and CF relied on Starr's description of his job duties in formulating their causation opinions, when their testimony establishes that they relied on the incident summary and job description supplied by the Pension Board, and on their years of experience examining firefighters with similar repetitive motion injuries. We agree with Starr that these issues, considered in combination, require the reversal of the Pension Board's denial of duty-related pension benefits.

## A.

We begin with the issue raised in Starr's Point IV. In its Decision, the Pension Board found that

> the only reasonable inference, based on the record, is that the medical opinions as to the duty-related causation of Mr. Starr's disability were derived from statements made by Mr. Starr himself to the physicians as to the work duties he allegedly performed for the KCFD, which as explained herein, we find largely lacking in credibility.

The portions of Starr's testimony which the Pension Board found to lack credibility were his statements concerning use of particular vibratory equipment: power tools, chainsaws, and driving a pumper truck.

16

Although the Board found that Drs. MP and CF relied on the portions of Starr's testimony which the Board had found not to be credible, they both testified that they did not discuss with Starr the frequency with which he purportedly used particular equipment involving exposure to vibrations. Instead, both doctors testified that they based their understanding of Starr's duties as a firefighter on a job description supplied to them by the Pension Board, and their own experience examining other firefighters experiencing similar repetitive motion injuries. Moreover, in their reports and testimony, the physicians highlighted numerous high-demand activities which contributed to Starr's nerve impingements, beyond use of power tools or driving a pumper truck. These activities included wearing heavy personal protective and breathing equipment; lifting heavy objects in awkward positions, in inclement weather and in extremes of hot and cold; high-force gripping and twisting activities; crawling; handling fire hoses; performing rescue operations; and forcible entry into buildings. Moreover, while both physicians testified that exposure to excessive vibrations could cause carpal- and cubital-tunnel syndrome, their reports and testimony emphasized the significant risks associated with performing tasks which were repetitive and required high force, in awkward positions and in adverse environments.

Thus, the Pension Board lacked substantial evidence to disregard the opinions of its own Medical Board members, on the basis that they had based their opinions on those aspects of Starr's description of his job duties which the Board had found to be inaccurate. Where an administrative agency rejects expert testimony on a basis which is contradicted by the record, the agency decision is

not a simple credibility determination to which we must defer. Instead, such an administrative determination is unsupported by substantial evidence, and must be overturned. *See*, *e.g.*, *Obermann v. Treasurer of State*, 681 S.W.3d 559, 564-65 (Mo. App. E.D. 2023); *Hazeltine v. Second Injury Fund*, 591 S.W.3d 45, 64-65 (Mo. App. E.D. 2019); *Abt v. Mississippi Lime Co.*, 388 S.W.3d 571, 578-80 (Mo. App. E.D. 2012) (citing and following *Highley v. Von Weise Gear*, 247 S.W.3d 52, 58-59 (Mo. App. E.D. 2008)).

**B.**

We also agree with Starr's second and third Points, which argue that the Pension Board improperly substituted its own opinion as to the cause of Starr's nerve impingements for the opinions of qualified experts. The Board relied heavily on the nature of Starr's work activities during the two-to-three years prior to his complaints in April-May 2020. In doing so, the Board effectively found that, without constant performance of debilitating work in the years immediately preceding his disability, Starr's work could not have caused his nerve impingements. The Board made this finding explicit with respect to Starr's chainsaw usage: it opined that, because Starr had not been assigned to particular pumper trucks in the sixteen months preceding his report of disability, "it appears implausible that repetitive work activity in the form of testing chain saws . . . substantially contributed to the onset of his disability in April of 2020."

The Board's belief that the causation question was answered by focusing on Starr's work in the two-to-three years immediately preceding his disability is directly contrary to the expert testimony. Drs. MP and CF testified that carpal- and cubital-tunnel syndromes develop progressively over many years, but will

only become disabling where the nerve impingements reach a "tipping point."

Thus, Dr. MP gave the following testimony in his deposition:

> Q: All right. And is this something that does, though, accumulate over years with repetitive activities with the upper extremities?
>
> A: It does. On peripheral nerve entrapments, whether it's the elbow or especially the wrist, initially what happens is the tendons become inflamed and swell with repetitive twisting, bending, lifting, use of their hands. And people notice symptoms that they might ignore or at least discount until they continue doing those duties, and then what happens is not only do the tendons become inflamed, but they cause swelling within the carpal tunnel.
>
> . . . .
>
> When the swelling becomes increased and overwhelming, then it puts pressure on the nerve to the point that individuals start noticing decreased sensitivity to pinprick, heat tolerance. They drop things. The median nerve supplies motor power to the thumb, index, and long fingers primarily. And it also has power over – or not power, but involves the sensitivity of the nerve involving those same digits; so eventually individuals have a tipping point where they develop symptoms.

Similarly, Dr. CF testified:

> A: You know, I think that what you have to understand about carpal tunnel syndrome, is that it is a gradual onset of entrapment of the nerve as it passes through the carpal tunnel. I love the word or the description calling tipping point. What happens is that as the pressure increases you may have relatively mild symptoms, but once it gets to the point where it is very tight and there is not any room for the nerve to move anymore, then all of the sudden you will notice a significant worsening in your symptoms to the point where they are intolerable. The so-called tipping point. That you can tolerate or live with whatever the mild symptoms are prior to that, but eventually it gets so tight that you can't cope with it anymore.

Q:     So kind of what I was talking about and what he described would be the classic, it is developing over years, over eight years, and then boom?

A:     I can live with it for seven years, and then boom, all of the sudden it has just gotten so tight now that whenever I do anything forceful, it is intolerable and I can't live with it.

In his reports, Dr. CF noted that, "[a]ccording to [Starr's medical] records, [he] had the gradual onset of numbness and loss in strength in his hands over a span of 8 years into 2020." Notably, the Board cited to no evidence to justify its focus on Starr's work activities in only the last two-to-three years of his career.

The Pension Board also focused exclusively on Starr's claims concerning his use of particular vibrating equipment:  power tools; chainsaws; and pumper trucks.  By doing so, the Board ignored the lion's share of the job duties on which the opinions of Drs. MP and CF relied.  The Board also ignored the opinions of Drs. MP and CF that Starr had no medical conditions, and no non-work-related activities, which could explain his nerve impingements.  The Board concluded that the experts' causation opinions were fatally undermined once the Board discounted Starr's use of power tools, and his operation of pumper trucks and chainsaws in the last three years of his career.  The Board cited no evidentiary basis to ascribe such significant weight to the inaccuracies it found in Starr's description of his job.

An administrative agency like the Pension Board cannot substitute its own views for the opinion of qualified experts, when the issue is medical causation beyond normal lay understanding.  Thus, in *Angus v. Second Injury Fund*, 328 S.W.3d 294 (Mo. App. W.D. 2010), we explained that in worker's compensation cases, the Labor and Industrial Relations Commission

may not substitute an administrative law judge's personal opinion on the question of medical causation of an injury for the uncontradicted testimony of a qualified medical expert. The question of causation is one for medical testimony, without which a finding for claimant would be based upon mere conjecture and speculation and not on substantial evidence. When expert medical testimony is presented, an ALJ's personal views of the evidence cannot provide a sufficient basis to decide the causation question, at least where the ALJ fails to account for the relevant medical testimony.

*Id.* at 300 (cleaned up).

This principle derives from the Missouri Supreme Court's decision in *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596 (Mo. 1994), in which an administrative law judge rejected an expert's opinion that a claimant's neck injury was the result of a work incident. The ALJ rejected the expert's causation opinion because the worker did not immediately complain of neck pain, and the ALJ believed that "an individual who suffers a herniated disc in his neck as a result of a traumatic event will have immediate, noticeable symptoms." *Id.* at 599 (cleaned up). The Supreme Court held that, without *evidence* supporting the conclusion that the onset of neck pain would be immediate, the Commission lacked substantial evidence to reject the expert's opinion. "[T]he specific medical conclusion that a herniated disc in the neck due to trauma will always have immediate noticeable symptoms is not clear, simple or well recognized by lay persons and is not a matter within the expertise of an administrative law judge." *Id.* at 600.

We have applied this principle in numerous worker's compensation cases: the Labor and Industrial Relations Commission cannot reject expert testimony concerning issues of medical causation, based on what amounts to an alternate view of the etiology of a medical condition, unless that alternate causation theory

is itself supported by substantial evidence. *See, e.g., Lynch v. Treasurer of State*, 635 S.W.3d 573, 583 (Mo. App. E.D. 2021) (where "[t]he sole expert medical evidence presented . . . was that Claimant is permanently and totally disabled because of a synergistic combination of his carpal tunnel syndrome and preexisting injuries," Commission could not instead conclude that claimant was permanently and totally disabled "without consideration of his carpal tunnel syndrome"); *Angus*, 328 S.W.3d at 302 (rejecting Commission's conclusion that claimant's "'rheumatoid arthritis . . . alone renders him permanently and totally disabled,'" where the medical testimony found that disability arose from the combination of rheumatoid arthritis and another condition); *Kliethermes v. ABB Power T & D*, 264 S.W.3d 626, 637–38 (Mo. App. W.D. 2008) (Commission could not reject claimant's medical evidence that electrical shock caused sudden deterioration in his cardiac condition, where "the view that the severe and uncontrollable aggravation of the claimant's heart conditions occurred abruptly by 'natural progression' [of a preexisting condition] is without any evidentiary support"); *Kuykendall v. Gates Rubber Co.*, 207 S.W.3d 694, 711-12 (Mo. App. S.D. 2006) (Commission could not reject expert's opinion concerning work-related cause of claimant's myofascial pain, based on claimant's three later falls on snow and ice, where there was no "medical testimony that Claimant's myofascial pain syndrome was caused by his falls on the ice or snow").

Multiple cases hold that the causation of carpal- and cubital-tunnel syndrome are matters outside lay understanding, and must be proven by expert medical testimony. *See, e.g., Bock v. City of Columbia*, 274 S.W.3d 555, 562 (Mo. App. 2008); *Elliott v. Indiana W. Express*, 118 S.W.3d 297, 299 (Mo. App. S.D.

2003); *Decker v. Square D Co.*, 974 S.W.2d 667, 669 (Mo. App. W.D. 1998). Consistent with this caselaw, Starr presented the opinions of three medical experts, each of whom concluded that his carpal- and cubital-tunnel syndromes were caused by his physically demanding work as a firefighter. While the Pension Board found that Starr's active firefighting work was limited in the two-to-three years before the onset of his disability, and that he had overstated certain of his job duties, there was no competent evidence that those issues would undermine the unanimous expert causation testimony. The Pension Board's conclusion that Starr had failed to prove that his disability was work related is unsupported by sufficient competent evidence, and must be reversed.

## Conclusion

We affirm the judgment of the circuit court, which reversed the Pension Board's Decision denying Starr a duty-related pension. The case is remanded to the Pension Board with directions to award Starr the duty-related disability pension benefits to which he is entitled.

Alok Ahuja, Judge

All concur.

23